**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Salvador Reza, | No. CV-11-1170-PHX-FJM |
| Plaintiff, | **ORDER** |
| vs. | |
| Russell Pearce, | |
| Defendant. | |

**I**. **Background**

Plaintiff is a Mexican-American and vocal critic of former Arizona State Senate President Russell Pearce. On February 22, 2011, plaintiff attended a public hearing at the Arizona State Senate building on a controversial immigration bill sponsored by Pearce. Because the Senate hearing room was filled to capacity, plaintiff and other members of the public were placed in an overflow room across the hall from the hearing where they could watch the proceedings via closed-circuit television. During the hearing, both opponents and supporters of the legislation in the overflow room could be heard to cheer and boo, causing disruption in the Senate hearing room. DSOF ¶ 22; PSOF ¶ 65. Members of the Senate notified Sergeant-at-Arms Joe Kubacki about the disturbances. DSOF ¶ 23. Kubacki informed the crowd that Senate rules of decorum prohibit applause, cheers, and boos and asked them to remain quiet. DSOF ¶ 25. Kubacki alleges that in response to his request,

1  plaintiff stood up and began to clap in a slow, rhythmic fashion, while other members of the
2  crowd began to clap with him. DSOF ¶¶ 26-27. Plaintiff denies this allegation and claims
3  that that he was not disruptive during the hearing. PSOF ¶¶ 64, 76.

4  Kubacki reported the disturbances to Pearce. As President of the Senate, Pearce had
5  the authority and obligation to maintain order and decorum so that the Senate could perform
6  its business. DSOF ¶¶ 35, 36. Pearce instructed Kubacki to "do what he had to do" to
7  maintain order, including ejecting disruptive individuals. DSOF ¶ 31. Kubacki advised
8  Pearce that it would be best to keep the disturbances to a minimum and finish the hearing
9  given the time of night, the agitation of the protesters, and the fact that the hearing was
10 almost over. Kubacki did not want the situation to escalate. Pearce agreed and no one was
11 ejected. DSOF ¶¶ 32-34.

12 After the hearing, Pearce instructed Officer Trapp to identify and photograph the
13 offenders from the overflow room and to deny them entrance to the Senate Building because
14 of their disorderly and disruptive behavior. DSOF ¶ 37. Pearce asserts that when he gave
15 Officer Trapp this instruction, he did not know that plaintiff was among those in attendance.
16 DSOF ¶ 38.

17 Two days later, on February 24, 2011, plaintiff entered the State Senate building to
18 meet with Senator Steve Gallardo to discuss pending legislation. Plaintiff was informed by
19 Officers Trapp and Burton that "by order of Senate President Russell Pearce he was no
20 longer allowed inside the Arizona State Senate building" due to "disorderly and disruptive
21 behavior." Compl. ¶ 11. Plaintiff was eventually arrested for trespassing, handcuffed, and
22 transferred to the Maricopa County Jail where he remained for about 5 hours. Plaintiff has
23 not been prosecuted for trespassing.

24 The following day Pearce released a public statement regarding the recent disruptions
25 at the Senate building. DSOF ¶ 48. He noted that during the early part of February 22, 2011,
26 protesters interrupted a news conference held by Senator Krysten Sinema, causing Senator
27 Sinema to fear for her safety. Capitol police arrested four people for disorderly conduct
28 during the incident. DSOF ¶¶ 13-15. It was against this backdrop that Pearce responded to

1  the disruptions from the overflow room later that same day. In his statement, Pearce noted
2  that these incidents not only interfered with Senate business but also presented "potentially
3  dangerous situations." DSOF ¶ 49. He warned that in order to fulfill his responsibility to
4  secure the Senate building, "we will be much more vigilant over misconduct by anyone
5  visiting this building." DSOF, ex. 1.1..

6  Three weeks later, on March 14, 2011, Pearce notified the Senate of new rules
7  concerning disruptions to Senate business. He explained that the first incident of disruption
8  would result in a two-week exclusion from the Senate building. A second disruption would
9  result in a 60 day exclusion, and finally a "pattern of disorderly or disruptive conduct" would
10 result in an indefinite exclusion. DSOF ¶¶ 52-53. There is no claim that plaintiff was denied
11 access to the Senate building on any day other than February 24, 2011.

12 Plaintiff filed this § 1983 action alleging that Russell Pearce prohibited him from
13 entering the Senate building not because of disruptive behavior, but because of his public
14 criticism of Pearce and his Mexican ancestry. Compl. ¶ 29. He denies that he was disruptive
15 during the February 22nd hearing. Therefore, plaintiff contends that there was no valid
16 reason to prohibit him from entering the Senate building and that doing so violated his clearly
17 established rights under the First Amendment.

18 We now have before us defendant's motion for summary judgment (doc. 87),
19 plaintiff's response (doc. 96), and defendant's reply (doc. 97). Pearce argues that he is
20 entitled to qualified immunity because under his obligation as Senate President to maintain
21 order and decorum he properly restricted plaintiff from the Senate building "because Reza
22 was a constant source of disruption and blatantly disregarded Senate rules and requests to
23 maintain order and decorum within the Senate Building." Motion at 1.

## II. Level of Scrutiny

25 The "First Amendment does not guarantee access to property simply because it is
26 owned or controlled by the government." U.S. Postal Serv. v. Council of Greenburgh Civic
27 Assocs., 453 U.S. 114, 129, 101 S. Ct. 2676, 2685 (1981). "[N]o mandate in our
28 Constitution leaves States and governmental units powerless to pass laws to protect the

1  public from the kind of boisterous and threatening conduct that disturbs . . . public and other
2  buildings that require peace and quiet to carry out their functions." <u>Gregory v. City of
3  Chicago</u>, 394 U.S. 111, 118, 89 S. Ct. 946, 950 (1969) (Black, J., concurring).

4  When assessing First Amendment rights to engage in protected speech on government
5  property, we first identify the nature of the forum, "because the extent to which the
6  Government may limit access depends on whether the forum is public or nonpublic."
7  <u>Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.</u>, 473 U.S. 788, 797, 105 S. Ct. 3439,
8  3446 (1985). Government property is classified into three categories. First, in traditional
9  public forums, such as public streets and parks, "any restriction based on the content of the
10 speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve
11 a compelling government interest." <u>Pleasant Grove City v. Summum</u>, 555 U.S. 460, 469,
12 129 S. Ct. 1125, 1132 (2009). Second, government entities create "designated public
13 forums" when "government property that has not traditionally been regarded as a public
14 forum is intentionally opened up for that purpose." <u>Id.</u> Speech restrictions in a designated
15 public forum "are subject to the same strict scrutiny as restrictions in a traditional public
16 forum." <u>Id.</u> Third, a government entity can establish a "limited public forum" by opening
17 property "limited to use by certain groups or dedicated solely to the discussion of certain
18 subjects." <u>Id.</u> at 471, 129 S. Ct. at 1132. The government may impose restrictions on speech
19 in a limited public forum "that are reasonable and viewpoint-neutral." <u>Id.</u>

20 It is undisputed that the Senate Building is not a traditional public forum such as a
21 street or sidewalk where the public has essentially unrestricted opportunity to engage in
22 public discourse. Similarly, there is no plausible claim that the State government has
23 intentionally designated the Senate Building as "a place or channel of communication for use
24 by the public at large for assembly and speech." <u>Cornelius</u>, 473 U.S. at 802, 105 S. Ct. at
25 3449.

26 Rather the Senate building is used for assembly and debate by elected representatives
27 engaged in lawmaking. While the Senate building is traditionally open to the general public,
28 the public's ability to engage in expressive activity is strictly limited. It is not an open forum

- 4 -

for public discourse. Nevertheless, a visitor's silent presence in a Senate hearing can amount to protected expressive activity. First Amendment rights "are not confined to verbal expression." Brown v. State of La., 383 U.S. 131, 142, 86 S. Ct. 719, 724 (1966) (silent vigil in segregated library held to be protected speech). Therefore, because the Senate building is open to the public for some limited expressive activity, we conclude that the Senate building is a limited public forum where restrictions on First Amendment rights are permissible "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" Cornelius, 473 U.S. at 800, 105 S. Ct. at 3448 (citation omitted). Thus, any restriction of plaintiff's access to the Senate building is constitutionally permissible if it was (1) reasonable, and (2) viewpoint neutral. Hopper v. City of Pasco, 241 F.3d 1067, 1074 (9th Cir. 2001).

### III. Qualified Immunity

Pearce contends that he is entitled to qualified immunity because he did not violate a clearly established constitutional right when he prohibited plaintiff from entering the Senate building on February 24, 2011. Qualified immunity shields a government official from liability for civil damages when his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (citation omitted). Deciding whether qualified immunity applies requires a two-step analysis that may be completed in either order. We decide whether a constitutional right was violated, and if so, whether that right was clearly established at the time the events occurred. Mattos v. Agarano, 661 F.3d 433, 440 (9th Cir. 2011). If either of these inquiries is answered in the negative, the official is entitled to qualified immunity. Lacey v. Maricopa County, 649 F.3d 1118, 1131 (9th Cir. 2011). A right is clearly established when a reasonable government official would understand that his actions violate that right. Reichle v. Howards, __ U.S. __, 132 S. Ct. 2088, 2093 (2012).

#### A.

Applying the reasonable and viewpoint-neutral level of scrutiny to the restrictions

1 placed on plaintiff's First Amendment rights, we first note that plaintiff's argument has
2 changed since this action was filed. Plaintiff originally alleged in his complaint that his
3 speech was restricted because of his Mexican ancestry and public opposition to Pearce.
4 When asked to provide evidence supporting this claim, however, plaintiff referred generally
5 to the allegations in his complaint and documents "disclosed in [his] initial Disclosure
6 Statement." DSOF ¶ 56. However, bare allegations cannot withstand a properly supported
7 motion for summary judgment. A party opposing a motion for summary judgment must set
8 forth specific facts showing that there is genuine issue for trial. Fed. R. Civ. P. 56(e).
9 Plaintiff did not attempt to further support this claim in his response to the motion for
10 summary judgment, and thus has effectively abandoned it. Because plaintiff has failed to
11 produce any evidence to support his claim that his rights were violated because of his
12 Mexican ancestry or political viewpoint, we conclude that the restriction was viewpoint
13 neutral and consider only whether the restriction was reasonable.

**B.**

15 A restriction on expressive conduct in a limited public forum must be reasonable "in
16 the light of the purpose of the forum and all the surrounding circumstances.'" Preminger v.
17 Peake, 552 F.3d 757, 765 (9th Cir. 2008) (quoting Cornelius, 473 U.S. at 809, 105 S. Ct. at
18 3453) ("Nothing in the Constitution requires the Government freely to grant access to all who
19 wish to exercise their right to free speech on every type of Government property without
20 regard to the nature of the property or to the disruption that might be caused by the speaker's
21 activities."). Courts have consistently held that a legislative body's restriction of the public
22 to maintain order and decorum is constitutionally permissible, and thus reasonable. "This
23 necessarily include[s] the authority to remove an unruly or disruptive member of the
24 audience 'to prevent his badgering, constant interruptions, and disregard for the rules of
25 decorum.'" Green v. Nocciero, 676 F.3d 748, 753 (8th Cir. 2012) (citation omitted).

26 Plaintiff asserts that he was not disruptive at the Arizona State Senate on February 22,
27 2011, "or at any other time material to this dispute." Response at 10. Five witnesses who
28 observed the Senate hearing in the overflow room all testified that plaintiff did not engage

1 in disruptive behavior. PSOF ¶ 74. Plaintiff contends that instead of removing him from the
2 public hearing on February 22, 2011, Senator Pearce simply banned him from entering the
3 Senate building for any reason for an indefinite period of time. Plaintiff cites Norse v. City
4 of Santa Cruz, 629 F.3d 966, 976 (9th Cir. 2010), for the proposition that a legislative body
5 may enforce rules of decorum only when an attendee is "actually disturbing or impeding a
6 meeting." Therefore, according to plaintiff, because he was not disruptive, Pearce's order
7 was unreasonable and therefore unconstitutional.

8 Even accepting as true that plaintiff was not disruptive, we nevertheless conclude that
9 Pearce is entitled to qualified immunity. Qualified immunity "gives government officials
10 breathing room to make reasonable but mistaken judgments." Ashcroft v. al-Kidd, ___ U.S.
11 ___, 131 S. Ct. 2074, 2085 (2011). It "provides ample protection to all but the plainly
12 incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341,
13 106 S. Ct. 1092, 1096 (1986).

14 The undisputed facts show that Pearce instructed Trapp to identify all individuals in
15 the overflow room who were disruptive, making no distinction between supporters and
16 opponents of the legislation. Pearce submits the affidavits of Senate Sergeant-at-Arms Joe
17 Kubacki and Arizona Department of Public Safety Sergeant Jeff Trapp attesting that plaintiff
18 was disruptive during the hearing. Therefore, Pearce believed that plaintiff was one of the
19 disruptive members of the crowd. This belief, coupled with the tense atmosphere at the
20 Senate building on February 22, 2011, the arrest of protestors earlier in the day, Senator
21 Sinema's expressed fear surrounding the level of protests, as well as the shooting of 18
22 people at a political rally in Tucson, Arizona just six weeks earlier, provided an objectively
23 reasonable basis for Pearce to conclude that action needed to be taken to protect and preserve
24 safety and decorum in the Senate building. Plaintiff presents no evidence to show that he
25 was somehow singled out for the disciplinary treatment. Absent such evidence, we conclude
26 that Pearce acted in an objectively reasonable manner when he issued the order excluding
27 from the Senate Building those individuals who had been disruptive at the February 22nd
28 meeting. If plaintiff was mistakenly targeted as a disruptive member of the crowd, "that was

unfortunate, but it did not violate the First Amendment." See Green, 676 F.3d at 754. Pearce is entitled to qualified immunity.

### IV. Conclusion

**IT IS ORDERED GRANTING** Pearce's motion for summary judgment (doc. 87). The clerk shall enter final judgment.

DATED this 27th day of December, 2012.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge